BAYRON T. GILCHRIST (State Bar No. 212393)
General Counsel
BARBARA BAIRD (State Bar No. 81507)
Chief Deputy Counsel
BRIAN S. TOMASOVIC (State Bar No. 314279)
Principal Deputy District Counsel
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
21865 Copley Drive
Diamond Bar, California 91765
Telephone: (909) 396-3400
Facsimile: (909) 396-2961
bgilchrist@aqmd.gov
bbaird@aqmd.gov
btomasovic@aqmd.gov

MATTHEW D. ZINN (State Bar No. 214587)
LAUREN M. TARPEY (State Bar No. 321775)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816
zinn@smwlaw.com
ltarpey@smwlaw.com

Attorneys for Plaintiff
SOUTH COAST AIR QUALITY
MANAGEMENT DISTRICT

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL S. REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency, <br><br> Defendant. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

Plaintiff South Coast Air Quality Management District ("South Coast AQMD" or "District") brings this action pursuant to the Clean Air Act (the "Act"), 42 U.S.C. §§ 7410, 7604(a)(2), to compel Defendant Michael S. Regan, in his official capacity as Administrator of the United States Environmental Protection Agency ("EPA"), to comply with his nondiscretionary duty under Section 110 of the Act to take final action on a State Implementation Plan ("SIP") revision submitted by the District and the State of California to EPA.

## INTRODUCTION

1.     In enacting the Clean Air Act, Congress established a partnership of "cooperative federalism" between EPA and the states to attain and maintain national air quality goals. 42 U.S.C. §§ 7401-7515. EPA establishes National Ambient Air Quality Standards ("NAAQS") for a variety of air pollutants. 42 U.S.C. § 7409; 40 C.F.R. §§ 50.1-50.19. The states are responsible for adopting regulations to reduce emissions of those pollutants based on strategies set forth in SIPs subject to review and approval by EPA. 42 U.S.C. § 7410; 40 C.F.R. §§ 51.1-51.38. The South Coast AQMD is the local agency responsible for air quality in the South Coast Air Basin, which includes Orange County and the non-desert portions of Los Angeles, Riverside, and San Bernardino Counties.

2.     Crucially, however, the Act *prohibits* the states and local agencies from setting emission standards for a wide variety of major sources of air pollutants, such as locomotives, trucks, airplanes, and ocean-going vessels. 42 U.S.C. §§ 7543(a), 7543(e)(1), (2), 7573. Instead, the Act charges EPA with regulating emissions from those sources, often referred to as "federal sources." 64 Fed. Reg. 39,923, 39,924 (July 23, 1999); 42 U.S.C. §§ 7409, 7601. Some of the most collectively significant sources of air pollution are under the sole control of EPA. The Act therefore demands that EPA take regulatory action to assist the states in attaining the NAAQS.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

3.    EPA has not kept up its end of the bargain. It has failed to take strong action to curtail emissions from federal sources—action that is *essential* to allow regions like the greater Los Angeles metropolitan area to attain the NAAQS. Although the State and South Coast AQMD have made enormous strides over the years to improve Los Angeles's notorious air pollution, state and local action alone cannot achieve the goal of attaining the NAAQS. Given the limits that the Act imposes on state and local regulatory authority, no amount of state and local pollution control effort will be sufficient to reach attainment. EPA has not taken the regulatory steps that only it can take to assist state and local governments in attaining the NAAQS.

4.    More specifically, EPA has failed to act on a portion of California's SIP submitted by the State and the South Coast AQMD. That submission—a "Contingency Measure Plan"—called on EPA to adopt the sort of regulation of federal sources essential for attainment of the NAAQS. The Act required EPA to act on that submission no later than July 1, 2021. Over one year later, EPA has failed to act on the submission and thus failed to comply with its clear statutory obligation.

5.    The Contingency Measure Plan is required by 42 U.S.C. § 7511a(e)(5), which allows an "extreme" ozone area such as the South Coast Air Basin to rely on control measures that anticipate development of new technologies as part of its plan for attaining the NAAQS. The state agencies responsible for an extreme ozone area must also submit contingency measures to be implemented if the new technologies do not achieve the planned emission reductions. These measures are due to EPA three years before the new technology measures would be implemented.

6.    The Contingency Measure Plan explained that 108 tons per day of nitrogen oxides ("NOx") emission reductions would need to come from new technology measures. Final Contingency Measure Plan (Dec. 2019), at 17, tbl.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1-5.[1] (Ozone is not directly emitted but is formed in the atmosphere by a chemical reaction between NOx and volatile organic compounds ("VOCs") in the presence of sunlight.) Thus, the Contingency Measure Plan describes alternative measures to obtain these reductions in the event the new technology measures would not achieve the planned reductions. The Contingency Measure Plan identified new measures both for the South Coast AQMD and for the California Air Resources Board ("CARB"). *Id.* at ES-4, tbl. ES-1. But fully 69 out of 108 tons per day—or 64% of the needed emission reductions—would have to come from regulation of federal sources and/or federal funding for replacing older vehicles with new, lower-polluting alternatives. *Id.* at 39.

7.      The Act authorizes the South Coast AQMD to file suit to compel EPA to carry out its mandatory statutory responsibilities, including its duty to take timely action on the District's Contingency Measure Plan. 42 U.S.C. § 7604(a)(2). Although the District values its relationship with EPA in working toward the common goal of reducing emissions, the urgency and severity of the nonattainment problem facing the District and residents of the Los Angeles area demand that the District file this lawsuit to push EPA to carry out its responsibility to combat emissions from federal sources.

## BACKGROUND

8.      The region known as the South Coast Air Basin ("Basin"), which coincides geographically with the greater Los Angeles area, has faced poor air quality dating back over eight decades. The first recognized episodes of photochemical smog (ozone) occurred in Los Angeles in the summer of 1943

---

[1] *Available at* https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2016-air-quality-management-plan/1997-ozone-contingency-measure-plan/1997-8-hour-ozone-draft-contingency-measure-plan---120619.pdf?sfvrsn=10.

4

with visibility reduced to only three blocks. That critical air quality problem prompted the California Legislature in 1947—23 years before enactment of the federal Clean Air Act—to develop the first significant air pollution control program in the nation. The Legislature created an agency tasked with air pollution control in each county in the Basin and later expanded and transferred that authority to the South Coast AQMD in 1977. While the Basin has, over time, achieved significant improvements in air quality through a combination of local, state, and federal air quality regulations and programs, it continues to suffer from the worst ozone pollution in the nation.

9.      In 1997, EPA set a new health-protective 8-hour ambient air quality standard for ozone at 80 parts per billion. *See* 40 C.F.R. § 50.10. EPA subsequently tightened this standard to 75 parts per billion in 2008 and to 70 parts per billion in 2015. *See* 40 C.F.R. §§ 50.15, 50.19.

10.     EPA has designated the Basin as being in "nonattainment" with each of the 8-hour ozone standards. 40 C.F.R. § 81.305. EPA has further classified the Basin as an "Extreme Area" based on the degree of the Basin's noncompliance with the ozone standards. *Id*. The Clean Air Act imposes a host of requirements and deadlines that specially pertain to extreme nonattainment areas.

11.     The Act directs state air quality regulators to submit SIPs that will allow their nonattainment areas to attain the standards. Under California law, the South Coast AQMD must prepare and submit a SIP for the Basin, and any revisions to it, to CARB and then to EPA for its approval or disapproval.

12.     Section 182(e)(5) of the Act requires a Contingency Measure Plan for Extreme Areas. 42 U.S.C. § 7511a(e)(5). Accordingly, on December 31, 2019, the South Coast AQMD submitted the Contingency Measure Plan through CARB to EPA for inclusion in the SIP.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

13.     The Act requires EPA to approve or disapprove any plan adopted under section 182(e)(5) according to the procedures for SIP submittals under section 110, 42 U.S.C. § 7410. Section 110 in turn assigns the EPA Administrator a mandatory, non-discretionary duty to act on such a SIP submittal according to specified deadlines:

a.     First, the Administrator must determine whether a SIP submittal is complete within six months of submission. 42 U.S.C. § 7410(k)(1). If the Administrator fails to make a timely determination of completeness, the SIP submittal is deemed complete by operation of law six months after submission. *Id.* § 7410(k)(1)(B).

b.     Second, within 12 months after a SIP submittal is determined or deemed to be complete, the Administrator must fully or partially approve or disapprove it. 42 U.S.C. § 7410(k)(2).

14.     The District's Contingency Measure Plan became complete by operation of law on July 1, 2020 because the Administrator failed to make a determination of completeness within six months of its submission. As of the date of the filing of this Complaint, the Administrator has not taken any action to fully or partially approve or disapprove the Contingency Measure Plan, in clear violation of his mandatory duty to act no later than July 1, 2021.

15.     The Contingency Measure Plan finds that the Basin will remain in extreme nonattainment unless and until EPA exercises its authority to secure further reductions of ozone-forming pollutants from sources that can only be controlled by the exercise of federal regulatory power.

16.     Federal commitments to reduce pollution, followed by implementation of those commitments, are needed to protect public health and welfare in the Basin.

17.     EPA disapproval of the Contingency Measure Plan would require EPA to develop and impose a Federal Implementation Plan ("FIP"): a plan with

6

1   federally-imposed emission limitations and standards necessary to ensure that
2   public health will be protected from the harmful effects of ozone air pollution.
3   42 U.S.C. § 7410(c). A FIP, as defined by the Act, is specifically designed to
4   supplement state planning: "a plan (or portion thereof) promulgated by the
5   Administrator to fill all or a portion of a gap or otherwise correct all or a portion
6   of an inadequacy in a State implementation plan." 42 U.S.C. § 7602(y).

7   18.   EPA disapproval of the Contingency Measure Plan could also
8   trigger the imposition of sanctions. The Act provides for two possible sanctions.

9   a.   The first is a 2-to-1 "offset sanction," which generally
10  prohibits any new construction that could generate pollutant emissions unless
11  each unit of increased emissions is offset with two units of emissions
12  reductions. 42 U.S.C. § 7509(b)(2). In practical terms, the offset sanction would
13  likely impose a construction moratorium in the Basin.

14  b.   The second sanction is loss of federal highway funding in the
15  Basin. 42 U.S.C. § 7509(b)(1). According to the 2020 Regional Transportation
16  Plan prepared by the Southern California Association of Governments, the
17  region expects $41 billion in federal transportation funding by 2045. Connect
18  SoCal 2020, Ch. 4, p. 105.[2] Thirteen percent of that funding, or $5.3 billion, is
19  CMAQ funds (construction mitigation and air quality) which would likely not
20  be withheld under the highway funding sanction. This leaves $35.7 billion in
21  funding for transportation projects that could be withheld in the event of
22  sanctions.

23  19.   The Clean Air Act's purpose in imposing sanctions is to induce
24  states to avoid or correct deficiencies in their SIP submittals. 42 U.S.C.
25  § 7509(a). Here, by contrast, any deficiency is outside the District's control and

26

27

28
___
[2] *Available at* https://scag.ca.gov/sites/main/files/file-attachments/0903fcon-nectsocal-plan_0.pdf?1606001176

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

ability to correct, because it is impossible to devise a contingency measure plan without relying predominantly on federal measures. The District therefore contends that imposition of sanctions in the event the EPA were to disapprove the Contingency Measure Plan would be contrary to law.

## JURISDICTION AND VENUE

20.   This Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a)(2) (citizen suits for failure to perform a nondiscretionary duty required by the Clean Air Act) and 28 U.S.C. §§ 1331 and 1361. The relief requested herein by the District is authorized under 42 U.S.C. § 7604 and 28 U.S.C. §§ 2201, 2202, and 1361.

21.   By certified letter to Defendant EPA Administrator Michael S. Regan posted on April 15, 2022, the District gave notice of this action ("Notice Letter") as required by section 304(b)(2) of the Clean Air Act, 42 U.S.C. § 7604(b)(2), and 40 C.F.R. Part 54. A certified letter receipt was sent to the District demonstrating that EPA received the Notice Letter on April 20, 2022.

22.   More than 60 days have passed since EPA received the Notice Letter from the District, but EPA has not remedied the violations alleged in the Notice Letter and in this Complaint.

23.   Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because the District's main office is located in Los Angeles County and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

24.   Plaintiff South Coast Air Quality Management District is a political subdivision of the State of California, organized pursuant to the law of the State of California. The District is obligated under California law to adopt and enforce rules and regulations to achieve and maintain the federal ambient air quality standards in all areas affected by emission sources under its jurisdiction. Cal. Health & Saf. Code § 40001(a). The District has the legal

8

1   capacity to sue and be sued in its name in all actions and proceedings in all
2   courts and tribunals of competent jurisdiction. *Id.* § 40701(b). Moreover,
3   California law designates the District as the "sole and exclusive local agency
4   within the South Coast Air Basin with the responsibility for comprehensive air
5   pollution control," with the "duty to represent the citizens of the basin in
6   influencing the decisions of other public and private agencies who might have
7   an adverse impact on air quality in the basin." *Id.* § 40412.

8       25.    The District is a person within the meaning of Clean Air Act
9   sections 302(e) and 304(a), 42 U.S.C. §§ 7602(e), 7604(a), and brings this action
10  on its own behalf.

11      26.    Defendant's failure to act to approve the Contingency Measure Plan
12  as alleged in this Complaint results in ongoing injury in fact inflicted on the
13  District because it makes it far more difficult for the District to carry out its
14  obligations to adopt and implement a SIP that will achieve and maintain the
15  NAAQS, and to implement its duties to achieve and maintain those standards,
16  including specifically the 1997 ozone standard and the 2008 and 2015 updates
17  to that standard. *See Nat'l Ass'n of Clean Air Agencies v. E.P.A.*, 489 F. 3d
18  1221, 1227 (D.C. Cir. 2007). If Defendant were to approve the Contingency
19  Measure Plan, the District's SIP would be approved and EPA would undertake
20  regulation of sources subject to federal control to assist in achieving and
21  maintaining the ozone standards. Even if Defendant were to disapprove the
22  Contingency Measure Plan, doing so would ultimately assist in achieving and
23  maintaining the ozone standards because EPA would become obligated to
24  promulgate a FIP to fill a gap in the SIP resulting from the fact that neither
25  the State of California nor the South Coast AQMD has regulatory authority to
26  set emission standards for federally controlled sources. As long as EPA fails to
27  act on the Contingency Measure Plan, it may maintain the position that it is
28  not obligated to regulate federally controlled sources so as to allow the Basin

9

to achieve and maintain the NAAQS either under its basic Clean Air Act authority or acting under a FIP.

27.   Plaintiff also brings this action on behalf of residents of the Basin and in the jurisdiction of the District. A government agency may bring an action in its proprietary capacity such as its interest in implementing its environmental controls and achieving clean air even though that interest is "congruent" with the interests of its citizens. *Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 790 (9th Cir 2014).

28.   Defendant's failure to take action on the Contingency Measure Plan has caused a procedural injury to the District that would be remedied by an order compelling Defendant to take such action. *See Oregon Nat. Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1094–95 (9th Cir. 1998).

29.   For all the foregoing reasons, the acts and omissions complained of herein cause the District ongoing, actual injury in fact for which it has no adequate remedy at law. Granting the requested relief would redress these injuries.

30.   Defendant Michael S. Regan is the Administrator of the U.S. Environmental Protection Agency, and in that capacity is charged with the duty to fulfill each of the responsibilities delegated to him, and to fulfill the objectives of the Clean Air Act and take all regulatory actions required therein. The District sues him in his official capacity.

31.   Defendant is responsible for ensuring EPA's compliance with the Clean Air Act. If ordered by this Court, Defendant has the authority and the ability to remedy the harm alleged in this Complaint by providing the requested relief.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

## STATUTORY AND REGULATORY FRAMEWORK

32.    The Act requires that EPA establish NAAQS for certain air pollutants that endanger public health and welfare, referred to as "criteria pollutants." 42 U.S.C. §§ 7408-7409. One such criteria pollutant is ground-level ozone. See 40 C.F.R. §§ 50.9, 50.10.

33.    The NAAQS establish maximum allowable concentrations of criteria pollutants in ambient air, i.e., outdoor air. Primary standards must be set at a level that protects public health, including that of sensitive populations such as children, the elderly, and people who suffer from asthma—with an adequate margin of safety. 42 U.S.C. § 7409(b)(1). Secondary standards must be set at a level that protects public welfare, including protection against damage to the environment. *Id*. §§ 7409(b)(2), 7602(h). EPA must review and, as appropriate, revise these standards at least every five years. *Id*. § 7409(d)(1). After EPA sets or revises a standard, the Act requires EPA to implement the standard. EPA must designate areas as not meeting the standard, or "nonattainment"; meeting the standard, or "attainment"; or, if EPA lacks information to make a designation, "unclassifiable." *Id*. § 7407(d)(1)(A)-(B). Simultaneous with designations, EPA must classify each ozone nonattainment area based on the severity of its ozone pollution. *Id*. § 7511(a)(1) tbl. 1. The classifications are, in increasing order of severity, "marginal," "moderate," "serious," "severe," and "extreme." *Id*.

34.    All areas of the country must attain and maintain these standards "as expeditiously as practicable but no later than" specified deadlines. *See id.* While the attainment deadline for areas classified as being in "marginal" nonattainment is three years from the date they are designated as in nonattainment, areas classified as being "extreme" areas have an attainment date of 20 years from the date of designation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

35.   Clean Air Act section 182, 42 U.S.C. § 7511a, sets forth the requirements for submission of SIP revisions in areas that are designated as in nonattainment, with extreme areas being assigned to prepare thorough submissions that generally encompass the requirements imposed on areas with less severe classifications along with additional, more stringent measures. *See* 42 U.S.C. § 7511a(e).

36.   Section 182(e)(5) of the Act, 42 U.S.C. § 7511a(e)(5), allows EPA to approve, for an extreme ozone area, "provisions of an implementation plan … which anticipate development of new control technologies or improvement of existing control technologies, and an attainment plan based on such provisions" if the Administrator is satisfied that the state has submitted an enforceable commitment to develop and adopt contingency measures should anticipated technologies not achieve planned reductions. Such contingency measures "shall be adequate to produce emission reductions sufficient, in conjunction with other plan provisions, to achieve … attainment by the applicable dates." *Id.*

37.   Any contingency measure SIP revision submitted under Section 182(e)(5) is due "no later than 3 years before the proposed implementation of the plan provisions." 42 U.S.C. § 7511a(e)(5).

38.   When it approved a SIP submittal for the Basin as an extreme nonattainment area for ozone in 1997, EPA noted that Title I of the Clean Air Act "set[s] out what amounts to a 'blueprint' by which nonattainment areas will attain the NAAQS." 62 Fed. Reg. 1150, 1154 (Jan. 8, 1997). It acknowledged that "[t]his blueprint couples SIP reductions with reductions from various Federal measures, such as reductions from mobile source measures promulgated by EPA under Title II of the Act" and that EPA must "fulfill[] its share of the 'blueprint' reductions needed for attainment." *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

39.   EPA has authority to commit itself to promulgate additional federal measures under Clean Air Act section 301. 42 U.S.C. § 7601. EPA has in fact exercised this authority previously, having committed to promulgate mobile source "controls which are determined to be appropriate for EPA and needed for ozone attainment in the [Basin]." 40 C.F.R. § 52.238.

40.   Within four years after EPA classifies an area for an ozone NAAQS, the state must adopt and submit to EPA a plan for implementation, maintenance, and enforcement of the standard. 42 U.S.C. § 7511a(c)(2). If EPA disapproves a required SIP revision, the Act requires EPA to promulgate a FIP within two years. *Id.* § 7410(c)(1).

## THE NECESSITY OF REGULATING FEDERAL SOURCES

### EPA Has the Authority and Responsibility to Adopt Control Measures to Allow the South Coast Air Basin to Attain the Ozone Standards

41.   In the 1990 Amendments to the Clean Air Act, Congress preempted the states from adopting emission standards for locomotives, farm and construction equipment, marine vessels, and lawn and garden equipment. Although CARB may regulate some of these sources with EPA authorization, locomotives, aircraft, and ocean-going vessels remain largely subject to exclusive federal control either by statute or because they involve international sources. This Complaint uses the term "federal sources" to refer to these sources that are subject solely to federal control.

42.   When Congress debated the 1990 Amendments to the Act, California congressional representatives pointed out that without federal regulation of these newly-preempted sources, Los Angeles would not be able to attain the standards. The legislative history shows that Congress intended that "EPA has the obligation … to adopt control measure[s] for sources which it exclusively controls when these controls are necessary to attain national [ambient air quality] standards." Congressional Research Service, A

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

Legislative History of the Clean Air Act Amendments of 1990 (1993) ("Leg. History"), p. 1127.

43.    Indeed, EPA has previously acknowledged its responsibility to adopt federal control measures where necessary to allow all areas to attain the NAAQS. It recognized "that massive further reductions are needed for attainment in the South Coast and that attainment may be either very costly and disruptive or impossible if further reductions are not achieved from national and international sources." 62 Fed. Reg. 1150, 1152-53 (Jan. 8, 1997).

44.    Accordingly, EPA made an "enforceable commitment" to adopt federal control measures and approved the Basin attainment plan for ozone. *Id.* at 1154.

45.    EPA has the authority and responsibility to implement control measures for federal sources as necessary to allow all areas of the nation to achieve and maintain the NAAQS and to approve a SIP submittal that relies on federal measures to help achieve attainment.

**The South Coast AQMD and the State Cannot Attain the Ozone Standards without Significant Reductions from Federal Sources**

46.    The Basin cannot attain the 1997 8-hour ozone standard without massive emission reductions from federal sources.

47.    By 2023, the Basin needs an additional 46 tons per day ("tpd") of reductions in NOx emissions from ships, locomotives, and aircraft, and further reductions of 21 to 23 tpd from federally-regulated heavy-duty on-road trucks, to attain the 1997 ozone standard in a timely manner. Revised Proposed 2016 State Strategy for the State Implementation Plan (March 7, 2017), p. 32;[3] Final Contingency Measure Plan at 39, tbl. 2-1.

48.    Attaining the 1997 standard with emission reductions only from sources that CARB and South Coast AQMD have authority to regulate would

_____

[3] *Available at* https://ww3.arb.ca.gov/planning/sip/2016sip/rev2016statesip.pdf

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

require eliminating all emissions from virtually all such sources. The region would need to eliminate (1) *all* NOx emissions from stationary and area sources (area sources are small ubiquitous sources such as residential wood burning and gas appliances); (2) *all* emissions from California-regulated on-road vehicles such as passenger cars, light trucks, and larger trucks originally registered in California; and (3) significant additional emissions from off-road sources such as farm and construction equipment.

49.    South Coast AQMD and CARB have been adopting and implementing the most stringent feasible measures for sources within their authority and are continuing to do so, while emission reductions from federal sources have lagged significantly behind. For example, between 2012 and 2023, NOx emissions from light-duty vehicles will have been reduced by over 70%, but NOx emissions from aircraft, locomotives, and ocean-going vessels will have *increased* by almost 10% over the same period. Final Contingency Measure Plan at 58.

50.    It is not yet possible to completely eliminate all emissions from stationary, on-road, and area sources of NOx in the Basin, which would include all California-regulated cars, buses, and trucks, and all industrial, commercial, and residential use of combustion processes, including boilers, heaters, and gas appliances.

**Any Disapproval of the South Coast Contingency Measure Plan and Subsequent Sanctions Would Be Contrary to Congressional Intent and Inconsistent with Applicable Law**

51.    As explained above, if EPA were to disapprove the Contingency Measure Plan and its reliance on federal measures, such disapproval would trigger sanctions under the Act. 42 U.S.C. § 7509.

52.    Sanctions are designed to encourage the state to take action as necessary to eliminate the basis for disapproval of a SIP submission. But in this case, CARB and the District cannot eliminate the Contingency Measure

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

Plan's reliance on federal measures because they lack the necessary authority to obtain the required emission reductions from federal sources. Their fate is entirely in the hands of the federal government.

53. Since the South Coast AQMD and CARB do not have control over the emissions causing nonattainment in the Basin, Congress did not intend for them to be subject to sanctions. *See, e.g.*, 42 U.S.C. § 7509a. The legislative history of the 1990 Clean Air Act Amendments shows that Congress did not intend sanctions to be imposed where the area to be potentially sanctioned does not have "adequate authority" to correct the air quality deficiency. Leg. History at 2658.

54. If EPA were to disapprove the Contingency Measure Plan and impose sanctions that the state and regional agencies have no ability to avoid because nonattainment results from emissions from federal sources, it would violate the doctrine that the law does not require impossibilities and the doctrine against absurd results.

55. Imposing sanctions on an area that cannot attain the standard because of emissions from federal sources, which are by statute beyond its control, would violate the Tenth Amendment of the United States Constitution. The State here does not have the choice of whether to suffer sanctions or regulate so as to attain the standard, because the State and South Coast AQMD have no ability to regulate in a way that would result in attainment.

56. Imposing sanctions on an area that cannot attain the standard because of emissions from federal sources, which are by statute beyond its control, would violate the Spending Clause of Article I, Section 8 of the United States Constitution. Where Congress imposes conditions on federal grants to the states, the Spending Clause requires that the states be given a choice whether to comply with those conditions or lose federal funding. In this case, the State and South Coast AQMD have no ability to regulate in a way that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

would result in attainment. They therefore have no choice about whether to lose federal funds.

## CLAIM FOR RELIEF

### (Failure to Perform Nondiscretionary Duty to Timely Act on SIP Submittal; 42 U.S.C. § 7604(a))

57.     The allegations of all the foregoing paragraphs are incorporated as if set forth fully here.

58.     Because the District's submission to EPA of its Contingency Measure Plan was deemed complete as of July 1, 2020, the deadline for Defendant to approve or disapprove the District's submission was July 1, 2021. 42 U.S.C § 7410(k)(2).

59.     As of the date of this Complaint, Defendant has failed to take final action on the District's Contingency Measure Plan.

60.     This constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of the Clean Air Act, 42 U.S.C. § 7604(a)(2), and violates the Act. EPA's violation is ongoing and will continue unless remedied by this Court.

## REQUESTED RELIEF

WHEREFORE, the District prays for judgment against Defendant as follows:

1.     Issue a declaratory judgment that Defendant's failure to take a final action to approve or disapprove the SIP revision, i.e., South Coast AQMD's Contingency Measure Plan, by the deadline required by 42 U.S.C. § 7410(k)(2) constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of 42 U.S.C. § 7604(a)(2) and thus violates the Act;

2.     Issue a mandatory injunction compelling the Administrator to act on the Contingency Measure Plan by a date certain;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

3.    Retain jurisdiction to ensure compliance with the Court's decree;

4.    Award the District its costs incurred in this action, including attorneys' fees; and,

5.    Grant the District such other relief as the Court deems proper and just.

DATED:  April 7, 2023                   SOUTH COAST AIR QUALITY
                                        MANAGEMENT DISTRICT
                                        SHUTE, MIHALY & WEINBERGER LLP


                                        By:    /s/ Matthew D. Zinn
                                               MATTHEW D. ZINN

                                               Attorneys for Plaintiff
                                               SOUTH COAST AIR QUALITY
                                               MANAGEMENT DISTRICT

1531648.8

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.